The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any matter or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. You may be seated. I want to welcome everyone to the Fourth Circuit Court of Appeals this morning. We have a couple of very interesting cases and good lawyers. We welcome you here. In our first case, Haysbert v. The Outback Steakhouse. Mr. Ariel. Good to have you with us, sir. And you're for Ms. Haysbert. That's correct. Yes, sir. Good morning. Good morning. May it please the Court. Judah Ariel on behalf of Plaintiff Appellant Joanna Wright Haysbert. And I'd like to reserve five minutes for rebuttal. There are three issues in this appeal, each one independently warranting reversal. First, is the exclusion of Plaintiff's medical expert, Dr. Filler, due to the supposedly untimely supplementation of his expert report. Second, Batson challenge. And third, the revocation of Plaintiff's trial counsel's pro hoc vicee admission. Beginning with that first issue, the District Court erred at each step of the analysis. So even if the new patient evaluation was a supplemental expert report, it was disclosed one day after the deadline. That is under Rule 26E. So it was late. It was late by about 15 and a half hours, correct. Well, late is late. It is, and we don't dispute that. Well, you said in your opening there, you said supposedly untimely. It was untimely. Yes, that's. Okay, go ahead. We concede that it was untimely, but we submit that that minimal delay of less than a day was harmless or justified because. There was an extended hearing on this before Judge Hayes, is that right? There was, yes. And that, I would commend the Court to actually review the entirety of that hearing. Were you involved in that hearing? I was not. There was another, was it Mary Morgan? Ms. Morgan, yes. Mary Morgan represented the Plaintiff at that, during trial. We have a transcript of it. And at that hearing, you saw very thoughtful responses by Judge Hayes to sort of a difficult situation that, of where there is significant delay between when, you know, when discovery originally happened, when expert disclosures originally happened, and when the trial comes eventually a few years later. There are going to be problems about sort of where you freeze factual questions, both for witnesses themselves and for experts. And really, so that's the harm. That's the source of the harm that happened here, that Dr. Haysbert had, you know, she continued to live her life. She chose to retire from work, and she continued to receive medical care, including from Dr. Filler, who prepared this new patient evaluation sort of, you know, as a medical record arising out of the treatment of Dr. Haysbert. But even if the new patient evaluation was properly excluded under Rule 37C, prohibiting Dr. Filler from testifying entirely was not justified under Anderson. First and foremost, the District Court never found that Plaintiff acted in bad faith, and that's sort of key to the analysis of the Anderson factors. Second, the only prejudice to the defendants that supported excluding Dr. Filler entirely was the claim that his testimony would be invariably tainted by what he learned since the time of his original expert report. That harm, however, would have existed regardless of when the new patient evaluation was disclosed. It would have existed even if the new patient evaluation had been disclosed the same day it was written, because that supposed harm is based on the passage of time and the fact that Dr. Filler learned new things as he treated the plaintiff. So to say that that is the prejudice from the untimeliness of the supplementation that justifies sort of the very drastic sanction of excluding this key expert witness entirely doesn't quite make sense. Was that your only expert witness? No, there were two medical witnesses in particular. There were a couple other experts on non-medical issues that were withdrawn before trial, but there was Dr. Filler, the medical expert, and Dr. Heider. But that doesn't mean that the testimony that both Dr. Filler and Dr. Heider would give or could give is duplicative. There were a few things that Dr. Filler could testify to that Dr. Heider would not have been able to, and specifically defendants argued the plaintiff didn't suffer a traumatic brain injury when she fell and that any symptoms she was suffering were the result of sort of aging or preexisting conditions. And Dr. Filler, however, could have testified and did testify during the first trial that the imaging of plaintiff's brain showed injuries that could only have come, that could only have been caused by a lateral impact trauma, that these weren't sort of progressive degenerative or chronic conditions we were looking at. We're here on abusive discretion review, and trial courts are granted great discretion, judges are granted great discretion in running trials and making decisions in motions like this one. And I don't, I hear what you're saying seems to be an argument you might have made before the trial court, but here I don't see how anything that you presented would be sufficient grounds for us to find that that's an abusive discretion. Well, on an abusive discretion standard, Your Honor, one can find an abusive discretion both if the reasoning is not supported by logic, as well as if the district court fails to take into account the factors that are supposed to guide it in the exercise of its discretion. And here, when talking about the imposition of sanctions under 37C beyond the automatic sanction of exclusion, the Anderson factors are supposed to guide the court's exercise of its discretion in terms of choosing what alternative sanctions are appropriate, if any. And here, the, well, first of all, there was no consideration of bad faith, which is the first factor in Anderson, and that's either in the initial oral decision or in the written decision on reconsideration. There are two of those, an oral decision and a written decision. Judge Haynes didn't rush him through this. He listened to everybody and discussed it with them. But that hearing lasted a couple hours, didn't it? Yeah, I believe so. Certainly, Judge Haynes listened to the parties, engaged with the parties, but no argument about that. But still, in coming to the decision that she came to, she did not take into account all four of the required factors. And I'd say, especially the last two factors, deterrence and the availability of lesser sanctions, that the deterrence one is not supported. The factual conclusions that she reached are simply not supported by the evidence. They're clearly erroneous because Judge Haynes talked about his previous issues concerning discovery, but all that had happened was really one set of requests to extend discovery that the magistrate judge denied, which is fine. And then the question of when subpoenas had to be issued. Did they have to be issued two weeks in advance of trial? You do have a couple other issues, and your time is running down. I'd like to hear about the Batson challenge. Certainly, on the Batson issue, the first thing I would say is that we still have not gotten, whether at trial or in their briefs, really an explanation from defendants as to why these three grounds, youth, shipyard employment, and silence during voir dire, are how those connect to an issue in this case or to a permissible trial strategy. And specifically in their briefs, they seem to acknowledge that at least for two of those, for the shipyard employment and for the silence, that those aren't really reasons for striking juror number 32. And I think it's a matter of logic. And don't they also say you somehow waived your argument as to the shipyard reasoning? They do say that. Right, and what's your response to that? Our response is that, one, you waived issues, not specific arguments. And two, at trial, plaintiff's trial counsel responded in as much detail to that argument as defendant's counsel made. Provided, which was nothing. Defendant's counsel said nothing about why working at the shipyard made any difference to anything. That's exactly right. And the fact that they're pointing to these characteristics that so clearly have no relation to any issues in the case and are really unable to explain even why shipyard employment has any bearing on anything in this case, is strongly suggestive that all of their reasons are pretextual. Is there a case that stands for that proposition, that if one reason perhaps doesn't support the argument, but others do, that it sort of taints the other two? I mean, I'm looking at the youth argument in particular, or the reason, and the fact that this juror is ten years younger than anyone else in the jury pool. And it does seem to me that in a case that's heavily reliant on medical evidence and perhaps arguments about frailty of the plaintiff, that it could be a reason to disqualify or strike a juror if they are much younger than the rest of the jury pool. I don't have a specific case on point, but I think as a matter of logic, you don't point to, if you have a bona fide reason for striking a juror, there's no reason to point to other reasons that don't have the same connection. So yes, I would say even if the youth issue on its own might have been permissible, might have even been convincing, the context, the fact that there are these other two issues, the fact that they chose to strike juror number 32, but not juror number 26, who they had originally challenged for cause because of cognitive issues with memory recall. Right, so I wouldn't give up on the youth issue so quickly, because they did keep at least one older juror on there who said he had cognitive issues. So if that's the reason they're striking the younger juror, it doesn't seem to hold weight since they left that guy on there. That's absolutely correct, because we're talking, this is not just about age in the abstract. It's about juror 32's youth, the fact that he was in his mid-20s as opposed to other jurors in their 30s and 40s. And I don't think it follows. Well, the younger jurors wouldn't have nearly as much life experience. And a lot of lawyers might desire to have jurors who have been around a block a few times have some life experience. And that would be a valid way to lose youth, I'm sure. I certainly understand that perspective. We take a different one. Pardon? I certainly understand that perspective. We have a different view. Well, that goes to age. So you strike the younger one and take the old one that's been around a block, and that goes to life. Excellent experience. Except that their arguments for striking the younger one would apply even stronger to striking an older juror, especially a juror who's dealing with cognitive health issues, because the reasons were the ability to understand, comprehend advanced medical terminology, advanced medical topics. And really there's no reason to believe that a 25-year-old is less capable of doing that than someone older who's having memory issues. The other explanation they gave was that aging and the effects of aging on cognition, in this case, make age relevant. Well, again, that might make age relevant on the older end. You know what that red light means? Yes, I apologize. You didn't finish your answer. Unless you want to borrow from your rebuttal time. No, I'll just finish the answer very quickly, that even if age would be a reason to strike someone on the older end, these concerns about cognition are not reason to strike somebody because they're too young. And you have to take into account the nature of the case as well. Thank you. You've saved some time. Thank you. Mr. McGavin. Good morning, Your Honor. Good to have you, sir. Thank you. Members of the Court, I'm John McGavin. Excuse me. I'm here on behalf of Outback Steakhouse of Florida. The analysis of this case, including the discussion about Dr. Filler, is tied very closely to the order that Judge Smith entered at the end of the decision to revoke the Pro Hoc Vice. Because when that occurred, she was very clear that Mr. Haysburg should not be participating any further in the proceedings going forward. And unfortunately, he did. So the trial, which lasted until almost 7 o'clock at night on that Friday, when I made that motion for mistrial and for revocation of the Pro Hoc status, we came back and the Court had a hearing and then granted that motion. And then the plaintiff had to make a decision, Dr. Haysburg, about how to proceed going forward. The Court set a new trial date in February 2024 and ordered us to a pretrial conference to go over exhibits and witnesses. Dr. Haysburg did not have a new attorney at that point, but when we had our meet and confer, Mr. Haysburg was participating in violation of the Court order, which we brought to the attention of the Court. Then Dr. Haysburg elected to take her voluntary non-suit and the conditions were that the case was stuck in stone, so to speak, that it was to be where it was with experts and evidence and the parties could not embark upon new discovery. Notwithstanding that timeline, we believe that Mr. Haysburg got . . . Dr. Haysburg to see Dr. Filler. And the reason that was done is because at trial, Dr. Filler did not have causation opinions that were admissible in our view and Judge Smith had some serious reservations about that. So there were definite holes in Dr. Filler's testimony that were evident during the trial. In particular, he had never spoken to Dr. Haysburg, he had never examined her, and his testimony was quite vague in that he was describing that she had conditions that would be consistent with, without rendering an opinion to a reasonable degree of medical certainty, that her condition was related. So there were obvious challenges and those challenges had not been resolved and Judge Smith's order even notes that the issue of the testimony of Dr. Filler was being left for the new judge to address. Consequently, filling the holes of Dr. Filler's testimony was an important component of any new trial. After the voluntary dismissal, the case was refiled again in June of 2024 and then we started back down the road again. Ultimately, if you examine JA1009 . . . And I recall Judge Smith had stepped aside . . . Yes, sir. . . . from senior status and Judge Haynes was appointed. Well, I think that Judge Haynes or Judge Smith was concerned that she had been the one to revoke the PROHUC's VJ status and also that she was concerned that by granting the mistrial that there would be any appearance of unfairness to Dr. Haysburg who was entitled to a fair trial just as we were on behalf of Outback and so she asked to step aside and Judge Haynes was then appointed. But the order that Mr. Haysburg was to stay out was still in force and in effect and at JA1009, Judge Haynes points out the number of times that he violated that order and stayed involved. And when we received on January 10, 2025, just essentially at the time of the pretrial, discoveries closed, two reports, one from Mr. Averitt, the liability expert, which was addressed to Mr. Haysburg and then this other report from January 3 of 2024, which was not addressed to Mr. Haysburg but obviously it was addressing the holes in the case and we objected. And Judge Haynes in her order spent a great deal of time going through that history but also trying to figure out how to remedy the problems because one of the questions that I had asked during the trial of Dr. Filler, going to the causation piece is, have you ever spoken to this person? Have you examined her? Do you know her medical history and the fact that she was reporting no complaints when she went to her health care providers? And to put Dr. Filler on the stand and then ask him those questions and then have him say no, no or not at the time that I was examining him made it very, very difficult to do the verbal gymnastics to properly have him testify. Plus the plaintiff brought Dr. Hayter to trial. She played an extensive video of the DTI, which is the diffusion tensor imaging study, which shows in her view the effect of trauma and effect on the brain. And that evidence came in. We challenged it based upon some literature from the American College of Radiology that the DTI is not a reliable study. But nonetheless, she fully and completely testified to all of the things that Dr. Filler could have. Notably, in the first trial, plaintiff had asked to have Dr. Hayter appear and testify remotely during trial, and that led to a delay of a day in the trial because Judge Smith said, well, wait a minute. You're making this motion the day before trial. Did you even make plane reservations, hotel reservations? Was any of that done? And there were four experts, three of which, all four were out of town, and she ordered him to explain. Were these people coming? What do we make of the fact that in ruling on the sanction motion, the district court didn't specifically engage in the first Anderson factor, the bad faith factor? It seems to be that they are requirements and not just suggestions. Your Honor, I also believe that the Southern States test can also be applied because this was a supplement and the Anderson case was a case of a default judgment. And even in a recent decision from the court in 2025, it's clear that there is some broader latitude with following Southern States, and I'd cite the court to Smith v. Devine, a January 2025 decision from the court. So, I believe that the Southern States factors are probably more applicable to this because this is a failure to supplement, and of course, I think it's also implicit in Judge Haines' ruling when she says going back over the history of this case, which is an enormous record on what is a run-of-the-mill slip-and-fall case, frankly. So . . . And if we disagree with you that Southern States is the relevant and applicable standard, then should we find that the exclusion exceeded the court's discretion? No, absolutely not because I think that the record is amply clear what Judge Haines was referring to when she says, given the history of this case and everything that has occurred, I believe that this ruling is appropriate, and that's why I mentioned in J.A. . . . beginning at J.A. 8008, through the balance of that opinion, her memorandum order of February 19, 2025, she talked extensively about the history of violating the court's previous orders and the interaction of Mr. Haysbert in obtaining the involvement of experts and reports in violation of the court orders. Was this the Devine case you just mentioned? Is that cited in your brief? No, it was not. We found it afterwards, Your Honor. Did you bring it to the attention of the court? No, we did not. We did bring to the attention of the court the document that we filed just a couple of days ago to supplement the record, which was the designation of Dr. Filler. It's actually a supplemental designation of a retained expert, and we have filed a motion for that to be made part of the record. That's a little late, isn't it? It's very late, Your Honor. What about delays? It's very late, and the court may not consider it, so I concede that fact, Your Honor. Addressing the Batson challenge, this is a case where we had the difficult task of a very prominent provost from Hampton University, obviously a very accomplished person, Dr. Haysbert, and we had to address the hard part that our evidence was that the changes on radiographic findings were age-related and that any subjective complaints regarding decline in cognitive ability could be related to getting a little older, like that happens. Like the juror that you left on? Like that juror, what impressed me about that juror is he was very forthcoming about it. His demeanor, he was very conscientious about it, and he came forward, and I had a difficult decision on whether to leave him on. And based upon what I saw from him, I believed that he would be true to the jury instructions and that he revealed information that he seemed quite confident that he would be fair. So that's why I left him on. As to the younger juror, I was concerned that his youth and failure to respond at all was me to guess. Well, he wasn't the only one that failed to respond to anything, correct? There were seven total potential jurors that failed to respond. But not all were on the panel, Your Honor. Five were. That may be, yes. That be. You left five on the panel that had been silent in the same way that the younger juror, that juror number 32 was. They were older, though. I'm sorry. Older, that's the distinguishing factor? That's one factor. What are other factors that distinguish those jurors from the one you struck? They did not work at the shipyard. I see that now. The shipyard I really wanted to ask you about because I don't see anything, at least in the, well, maybe you can point me to somewhere in the record where you explain why working at the shipyard is somehow disqualifying. Did the provost work at the shipyard at some point? No, no, no. Dr. Haysbert never did. It's personal experience having tried many cases, including having probably my biggest verdict ever, over $5 million where we found out we had shipyard workers. Where's that in the record as a reason? It's not. We did not go into that detail. Don't you have to have the reason contemporaneous on the record? Well, it's nowhere. You have to have the reason on the record somewhere. So this is just he worked at a shipyard. That's all. Well, my thought process relates to my extensive experience. Well, and if that was the case, and that being the case, it seems like given your extensive experience, you would have made a record of that. I regret that I didn't make a stronger record, but I think the judge, being in Newport News in Norfolk, is able to judge concerns that may come from that. She did not question that, and she also had the opportunity to judge my credibility and my responses to her questions. She did have some concerns, particularly she expressed concern that defendants moved to strike juror number twenty-six for cause, but didn't strike juror number twenty-six using one of their preemptory challenges, who is Caucasian, but did strike the black juror. He was older, and as I considered . . . You're saying twenty-six was older? Yes, he was quite elderly. So it all comes down . . . You're saying it all comes down to youth? Pardon? You're saying that it all comes down to youth, that the distinguishing factor in your mind was that this person was young versus all the jurors that were selected, not that this person was black and the plaintiff was black versus all the jurors that were selected that were white and also silent. It had nothing to do with race. It had everything to do with what was going to be the defense of the case, which is Dr. Haysbert is a distinguished person of great accomplishment, and we have to say to her and to the jury, Dr. Haysbert, you're well into your seventies now, and your complaints of cognitive deficits, memory forgetfulness, distraction in our evidence are related to age, and that was a significant factor that I felt on balance deciding between a twenty-four-year-old gentleman . . . And which part of the record do you think you most clearly say that in the way that you're saying it now? It starts on JA11. It doesn't go long. JA11, I mean 1100 to 1104. It was a very short discussion, Your Honor. We did it as a sidebar, so that was very awkward. At a sidebar, the judge walked down around the bench, and we're at the sidebar with the court reporter. And you're at the sidebar because there's potential jurors sitting in the . . . Everybody was there. Okay. The veneree as well as the jurors. The lawyers came to the bench. We came around to the right side of the bench, Your Honor, over to this side, and the jury was across the way. But the court reporter was there with you. Yes, sir. The court reporter was there, and the court did not invite or send the jury out so that we could have a fulsome discussion. I don't fault the judge for that. Your Honor, you raise a good question. I wish I had been more fulsome in discussing it or asked to do this outside the presence of the jury so I could explain it. But Judge Haynes was pretty quick to judge it and heard my thought process, and she ruled. But it was one of those times in the middle of a trial where you're at the sidebar, everybody's there, and I wish I had made a more fulsome record, but I had honest, truthful reasons. I think that you're permitted also to judge demeanor in the way that's presented, and I think she did. I did not hear any questions from the court regarding Judge Smith's order to disqualify counsel. I'm not sure procedurally how we get to that, but the record is quite fulsome that the conduct of the... Well, he mentioned that issue, but I don't think there was something about your colleague there. He mentioned the issue early on but didn't get to it. I understand. So all I can say... You can go ahead and say whatever you want to. I just have a couple of minutes and I'll just say briefly that the conduct of the trial was unlike any I've ever seen and the most shocking was when Mr. Hayesburg took his books and slammed them on... Mr. Hayesburg is a lawyer and he was the son of the plaintiff. That's right, Your Honor, and took his books and slammed them down in protest over really what was happening. He did it a couple of times, which was quite shocking. And then injecting the issue of insurance, it almost... It was so patently obvious that even when he got to the point and said to the judge, I will not mention the word insurance again, that we were having a major problem. And there were so many incidents of trial that it was so evident that we, on behalf of Outback, were going to have a hard time having a fair trial, but more significantly, the disrespect to Judge Smith and to the process, to everyone involved, was overwhelming. But I think the record is clear on her thoughts and her order. Unless the judges have any further questions for me, I want to thank you for this opportunity to be heard. Thank you, Mr. McGavin. Thank you. Mr. Ariel, it's good to have you for the rebuttal. Go right ahead. Thank you, Your Honor. I'd like to hopefully get to five points briefly. First, Mr. McGavin talked about the new patient evaluation filling in to holes in Dr. Filler's testimony based on defendants' view of what was lacking in his initial testimony, his initial expert report. But I would just point out that Judge Haynes actually rejected all of those sort of preexisting challenges, rejected the notion that he hadn't made an opinion to a reasonable degree of medical certainty, found that he was able to testify based only on his initial report as to causation. So there's really no need to do anything with the new patient evaluation, given what Judge Haynes actually ruled on the objections. Second, my learned colleague said that Dr. Hayter testified to everything that Dr. Filler could have. I would disagree with that in a number of ways, but sort of most specifically, Dr. Hayter talked about this being a coup-contrecoup injury with bruising on both sides. Their medical expert looked at it and had a different view. Using DTI, using these advanced imaging techniques, Dr. Filler was able to see damage to the crust of the fornix that isn't otherwise viewable, and based on his expert opinion, determined that the word he used was pathogenomic, that when you see that effect, you know that the cause was a lateral impact trauma. It wasn't old age. It wasn't some sort of progressive disease. Can you address the argument that your friend made about whether we should be applying Anderson or Southern States in this instance? In other words, whether that faith requirement is a necessary consideration? Yeah. Southern States obviously governs the question of exclusion of the undisclosed or late disclosed whatever it is, but Southern States is a way of figuring. It guides the determination of whether the nondisclosure or blade disclosure was harmless or substantially justified. That's a question only with respect to the disclosure and to the exclusion of the thing disclosed or late disclosed. That can't guide because those aren't the standards for the alternative or additional sanctions. And so as Anderson said, the imposition of sanctions under Rule 37 is guided by these four factors. Southern States said, yes, except for the decision over whether to exclude. And then on top of that, the reasons given in Southern States as to why there's this different treatment because there's guidance in the rule itself in one place and much more vague guidance in the other would also support the notion that Anderson is what guides whether to go beyond that automatic sanction. Number four, I would disagree with my friend. These previous issues concerning discovery, none of them point to the violation of any court rule or court order as we explain in our briefs. And finally, because I have 30 seconds left, with respect to the revocation of Mr. Haysbert's pro hoc vicee, that issue really is determined by Ballou. It falls, this court's decision in Ballou versus Leventhal that says there's got to be notice and opportunity to be heard and that under Ballou... You said you raised in your brief procedural due process. You're talking about the procedural due process to the lawyer or to the plaintiff? Well, in this issue, the... I think I read it that you're talking about as to the lawyer, but he's not a party here, that he was disqualified without procedural due process, but he's not a party. He's not, but in this situation, and I do see my time is up, but if I may be permitted to just answer your question. I'm going to give you an opportunity. Mr. McGarrett raised it for you. First of all, you have statements from the Supreme Court in Richardson-Merrill that if the attorney is dissatisfied with the... But Judge Spitz cataloged the misconduct thoroughly, talking about insurance before the jury. That's... From what I've experienced, that's a no-no in every court. Understood. And I would point the court to Judge Haynes's review of the sanctions motions, where she found out that he didn't intentionally inject insurance into the case. That wasn't the only thing. She cataloged it all. You're not talking about... I don't think in your brief that the due process rights of your clients, you're talking about due process rights of the former lawyer. That's right, but even... Well, you're on the wrong path. Maybe he's got some due process rights to complain about, but that's not for this proceeding. Well, here we would argue that the requirements for sort of third-party standing to a certain issue have been met. First, the litigant, Dr. Haysbert, has herself suffered a reversible injury that she herself has constitutional standing. Second, that... Maybe she's got a claim against her son for acting up and getting thrown out of the case. That might be it. Well... But you're talking about the judge then treats the other lawyer, your predecessor in this case, fairly. And he's not a party here. But by doing that, ended up denying the plaintiff sort of the counsel of her choice, and that she's in a position where she's allowed to assert... But he also got himself disqualified. That's what happened. And the district judge, Judge Smith, experienced district judge threw him out. He revoked his pro hoc vice credentials and granted a mistrial to protect your client. And that's how we ended up here. But gave you another trial. Well, and our argument is that that very well may have come out a different way had sort of the due process rights been followed, had Mr. Haysbert and Dr. Haysbert had an opportunity to... So you're talking about his due process rights? Yes. That's what I thought. And I think I'm giving you an extra three and a half minutes here. But... And just like I said on that, we do believe that there would be third-party standing for Dr. Haysbert to assert that if it's considered his right and not hers. I understand your position. All right. Thank you very much. Thank you. And we'll take the... We appreciate counsel's arguments and submission. And we will take the case under advisement. And we will now come down and greet counsel and call the next case.
judges: Robert B. King, Stephanie D. Thacker, Nicole G. Berner